**This order is SIGNED.**

**Dated: December 23, 2024**



_____
**PEGGY HUNT**
**U.S. Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>**JOSHUA BEN BIRCHELL**<br><br>Debtor. | Bankruptcy Case No. 21-25187<br><br>Chapter 7 |
| **JOSEPH ARNOLD**, an individual, **BRAD HALL**, an individual, **HEATHER THOMPSON**, an individual, **SUNNY HARKER**, an individual, **LOGAN HALL**, an individual, **COLE HALL**, an individual, and **WESTERN CHEMICAL, LLC**, a Nevada limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>**JOSHUA BEN BIRCHELL**,<br><br>Defendant. | **Adv. Pro. No. 22-2017**<br><br>**Honorable Peggy Hunt** |

---

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

A trial in the above-captioned adversary proceeding (the "**Proceeding**") commenced on

August 28, 2024. Scott A. Hagen and James A. Sorenson, Ray Quinney & Nebeker, P.C.,

appeared on behalf of Plaintiffs Joseph Arnold ("**Arnold**"), Brad Hall, Heather Thompson,

Sunny Harker, Logan Hall and Cole Hall (collectively, the "**Hall Family**"), and Western

Chemical, LLC ("**Western**") (collectively with Arnold and the Hall Family, the "**Plaintiffs**").

Matthew M. Boley, Cohne Kinghorn, P.C., appeared on behalf of Defendant Joshua Ben Birchell ("**Birchell**" or "**Defendant**").

The Court received testimony from Arnold,[1] Cole Hall,[2] Brad Hall,[3] Birchell,[4] Brian Bailou, and Andrelee Birchell ("**Andrelee**").[5] The Court also received into evidence the sworn testimony of Dusty Jensen ("**Jensen**"), Steven Lamb ("**Lamb**"), Jessie Ducan ("**Duncan**") and Birchell set forth in designated portions of the transcripts at Plaintiffs' Exhibit 14 ("**Jensen Tr.**"); Exhibit 15 ("**Lamb Tr.**"); Exhibit 16 ("**Duncan Tr.**"); Exhibit 17 ("**Birchell 2018 Tr.**"); Exhibit 19 ("**Birchell 2023 Tr.**"); and Exhibit 20 (the "**Birchell 2021 Tr.**").[6]

The following Exhibits were also received: Plaintiffs' Exhibits 1 – 4, 6, 8 – 9 and 11 – 12; and Defendant's Exhibits A, C – K,[7] M – R and T.[8] Exhibit 2 is the *Findings of Fact and Conclusions of Law and Order and Judgment* (the "**FFCL**") issued by the Eighth Judicial District Court in and for Duchesne County, State of Utah (the "**State Court**") in a lawsuit captioned <u>Arnold *et al*. v. Birchell *et al*.</u>, Civil No. 170800014 (the "**State Court Lawsuit**").

---

[1] Adv. P. Dkt. No. 74 (Audio Rec. of Arnold Test. Aug. 28, 2024 (hereinafter "**Arnold Tes.**")).

[2] Adv. P. Dkt. No. 74 (Audio Rec. of Cole Hall Test. Aug. 28, 2024 (hereinafter "**Cole Hall Tes.**")).

[3] Adv. P. Dkt. No. 74 (Audio Rec. of Brad Hall Test. Aug. 28, 2024 (hereinafter "**Brad Hall Tes.**")).

[4] Adv. P. Dkt. No. 75 (Audio Rec. of Birchell Test. Aug. 29, 2024 (hereinafter "**Birchell Tes.**")).

[5] Adv. P. Dkt. No. 75 (Audio Rec. of Andrelee Test. Aug. 29, 2024 (hereinafter "**Andrelee Tes.**")).

[6] *See* Adv. P. Dkt. No. 62 (Pls. designations); Adv. P. Dkt. No. 67 (Def. counter-designations); Adv. P. Dkt. No. 75 (Audio Rec., Aug. 29, 2024, at 9:42 – 9:56 a.m., 12:44 – 12:48, 1:05 – 1:09 p.m. (stipulations and rulings related to designated portions of Exhs. 17, 20); *id.* 1:48 – 1:51 p.m. (Exhs. 14 - 16).  *See also* Adv. P. Dkt. No. 64 (stipulation waiving publication of original transcripts).

[7] Def. Exh. F is identified as "E-Mail from Cole Hall to Joe Arnold, et al. (Feb. 7, 2014)." The first page of the document, which is not a copy of the email, appears to have been inadvertently included. Plaintiffs stipulated to the admission of Exh. F provided that the first page was removed. *See* Adv. P. Dkt. No. 66, p. 3.

[8] Pls. Exh. 3 is duplicative of Def. Exh. G, and Pls. Exh. 9 is duplicative of Def. Exh. C. For ease of reference, the Court will use Pls.'s numbered Exhibits to identify the respective documents and reference to the numbered Exhibits will also be deemed to be a reference to the corresponding Def. Exhibit.

The FFCL include "**Stipulated Facts**"[9] and "Additional Facts Proven at Trial" (hereinafter, the "**Trial Facts**"),[10] both of which are referenced below.

Based on the stipulated facts set forth in the *Pretrial Order*;[11] evidence received at trial; the arguments of the parties, including those set forth in the *Plaintiffs' Trial Brief*[12] and the *Defendant's Trial Brief*;[13] the Court's independent review of the law; and good cause appearing, the Court enters the following findings of fact and conclusions of law:[14]

## I.   <u>JURISDICTION AND VENUE</u>

1.      The Court has jurisdiction of this Proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b), and the District Court's Order of Reference at DUCivR 83-7.1. *See* Pretrial Order, ¶ 1.

2.      Pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b), the Court may hear and determine this Proceeding because it arises under title 11 of the United States Code (the "**Bankruptcy Code**"), arises in or is related to the above-captioned bankruptcy case (the "**Bankruptcy Case**"), and is included as a "core proceeding" in 28 U.S.C. § 157(b)(2)(I). *See* Pretrial Order ¶ 1.

3.      Venue of the Bankruptcy Case and this Proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. *See* Pretrial Order, ¶ 2.

---

[9] Exh. 2, pp. 2 – 11.
[10] Exh. 2, pp. 11 – 18.
[11] Adv. P. Dkt. No. 50.
[12] Adv. P. Dkt. No. 54.
[13] Adv. P. Dkt. No. 53.
[14] *See* Fed. R. Civ. P 52 (a)(1) made applicable in this Proceeding by Fed. R. Bankr. P. 7052. Findings of fact are deemed, to the extent appropriate, to be conclusions of law and conclusions of law are similarly deemed to be findings of fact and shall be equally binding as both.

II.    **FINDINGS OF FACT**

A.    **MSAs and the Relevant Companies and Principals**

MSAs

4.    Energy companies operating in Utah's Uinta Basin, such as Western, typically require suppliers to have a pre-existing *Master Services Agreement* ("**MSA**") allowing them to do specific types of business with the company requiring services or supplies. Arnold Tes., at 11:27 a.m.; *see* Exh. 2 (FFCL, Stipulated Facts, ¶ 26).

5.    There is an involved process to get an MSA from a company and it typically takes several months or even years to obtain. Exh. 2 (FFCL, Stipulated Facts, ¶ 26).

Western

6.    Western is a limited liability company organized under the laws of the State of Nevada with its principal place of business in Roosevelt, Utah. Exh. 2 (FFCL, Stipulated Facts, ¶ 1); *see* Exh. 8 (First Amended Operating Agreement).

7.    Western is a chemical supply company that specializes in supplying industrial chemicals to businesses operating in the oil and gas industry. Pretrial Order, ¶ 4.23; Exh. 2 (FFCL, Stipulated Facts, ¶ 5). Western was wholly owned and managed by Arnold prior to 2014, and part of its business was the sale of potassium chloride ("**KCl**") substitutes. Its core business, however, was supplying other chemicals. Arnold Tes., at 11:24 – 11:26 a.m.

8.    Western was restructured in 2014. After the restructuring, Western's ownership was modified as discussed in Part II.B *infra*. The company continued its prior business, but also began selling KCl. Pretrial Order, ¶ 4.25; Exh. 11 (Profit and Loss Statement, January 2014 – December 2016); Arnold Tes., at 11:25 – 11: 30 a.m.

9.      Arnold served as Western's general manager. Arnold Tes., at 11:25 – 11:30 a.m. and 1:28 p.m. Cole Hall became Western's managing member and was active in dealing with Western's finances through Brad Hall & Associates ("**BH Associates**"). Arnold Tes., at 11:38 – 11:39 a.m. and 1:28 p.m.; Cole Hall Tes., at 2:03 – 2:06 p.m.

10.      At all times relevant, Western had MSAs, including with a company defined below as "**Badlands**." *See* Arnold Tes., at 11:27 – 11:28 a.m.

<u>Absolute Fluids</u>

11.      A company referred to as "Absolute Fluids" ("**AF**") was formed in 2013. AF was engaged in selling KCl and, possibly, brine water. Arnold Tes., at 11:27 a.m.; Exh. 17 (Birchell 2018 Tr., p. 35:15-22).

12.      AF members included Arnold, Birchell, Sam Taylor ("**Taylor**") and a member of the Hall Family. Arnold Tes., at 11:27 a.m.; Exh. 17 (Birchell 2018 Tr., p. 17:1-4).

13.      Birchell did not contribute capital when AF was formed in 2013. Arnold Tes., at 11:31 a.m. and 1:55 p.m.; Birchell Tes., at 10:28 a.m. Birchell contributed his KCl knowledge, and was the person at AF responsible for mixing, dispatching and selling KCl. *Id.*; Exh. 17 (Birchell 2018 Tr., p. 18:13-16); Exh. 19 (Birchell 2023 Tr., p. 43:9-11). At this time, Birchell had many years of experience producing and supplying KCl and had many business connections related to KCl supply work. Pretrial Order, ¶¶ 24, 25; Exh. 2 (FFCL, Stipulated Facts, ¶ 8); Birchell Tes., at 10:30 – 10:28 a.m.; *see* Arnold Tes., at 1:56 p.m.

14.      AF used Western's MSAs to bill its KCl clients. Arnold Tes., at 11:27 – 11:28 a.m.

15.      In late 2013 or 2014 AF dissolved as part of Western's restructuring. Arnold Tes., at 11:28 – 11:30 a.m.; *see infra* Part II.B.

Birchell and BBOS

16.      Birchell is a resident of Roosevelt Utah. In addition to his affiliation with AF and
Western, Birchell owned and operated BB Oilfield Services, Inc. ("**BBOS**"), a corporation
organized under the laws of the State of Utah with is principal place of business in Duchesne
County, Utah. Exh. 2 (FFCL, Stipulated Facts, ¶¶ 2, 3, 22).

17.      BBOS is an oilfield service company that primarily specialized in supplying
contract lease operators and flowback testing. Exh. 2 (FFCL, Stipulated Facts, ¶ 22). Prior to
2016, BBOS did not sell any form of chemicals. *Id*.

18.      BBOS existed prior to the formation of AF and Birchell continued to operate it at
all relevant times. Birchell Tes., at 10:33, 10:36 a.m.

19.      BBOS had one MSA with EP Energy, but not with Badlands. Birchell Tes., 10:37
a.m.; Andrelee Tes., at 4:16 p.m.

20.      Birchell obtained income from BBOS. *See* Exhs. H, I, J (Tax Returns). He
supported his family from BBOS income while he was at AF, but it was not enough to support his
family in 2016. Birchell Tes., at 10:40 – 10:41 a.m. and 1:09 – 1:10 p.m.; Exh. 19 (Birchell 2023
Tr., pp. 36:21 – 37:4); Andrelee Tes., at 4:00 – 4:03 p.m.

21.      Prior to 2016, BBOS did not engage in KCl work. Exh. 2 (FFCL, Stipulated Facts,
¶¶ 22, 23).

Duncan and Badlands

22.      A company referred to as "**Badlands**" was an energy company based in Roosevelt,
Utah that at all relevant times engaged in fracking work in Utah's Uinta Basin. Exh. 2 (FFCL,
Stipulated Facts, ¶¶ 16, 24). Duncan was an employee of Badlands from 2013 – 2017. Exh. 16
(Duncan Tr., p. 129:11 – 23).

23.     Duncan was the point man for the KCl work on Badland's fracking project referred to herein as the "**Badlands Job**." Exh. 16 (Duncan Tr., p. 134:10 – 12).

24.     Duncan and Birchell had a long-standing friendship. Exh. 2 (FFCL, Stipulated Facts, ¶¶ 16, 17 and Trial Facts, ¶ 3). Birchell Tes., at 12:56 p.m.; Exh. 16 (Duncan Tr., at p. 132:13 – 19).

### Jensen and DJ Oilfield

25.     Jensen was employed by Western as an account manager during all times relevant through at least the first half of 2016. Exh. 14 (Jensen Tr., p.11:19 – 25); *see* Pretrial Order, ¶ 4.46; Exh. 2 (FFCL, Stipulated Facts, ¶ 27).

26.     Jensen is a well-known acquaintance of Birchell, and he owns a company known as "DJ Oilfield Services" ("**DJ Oilfield**"). Pretrial Order, ¶ 4.45; Exh. 2 (FFCL, Stipulated Facts, ¶ 27).

27.     At all times relevant, DJ Oilfield was qualified to do business with Badlands pursuant to an MSA. Pretrial Order, ¶ 4.43; *see* Exh. 2 (FFCL, Stipulated Facts, ¶ 25).

28.     DJ Oilfield typically did flow back work for Badlands. Exh 14 (Jensen Tr., p. 21:7 – 11).

29.     In 2016, DJ Oilfield also billed KCl work on the Badlands Job through its MSA. Exh. 2 (FFCL, Stipulated Facts, ¶ 25). *See infra* Part II.G, ¶¶ 131 – 138.

### Lamb and Black Sheep

30.     Lamb partially owned a hauling services company known as "Black Sheep Trucking" ("**Black Sheep**"). Exh. 2 (FFCL, Stipulated Facts, ¶ 30).

31.     Lamb, through Black Sheep, worked with KCl since at least 2013. Black Sheep

hauled components of KCl for Western. Exh. 2 (FFCL, Stipulated Facts, ¶ 30); Exh. 15 (Lamb

Tr., pp. 11:10 – 12:19, 15:7 – 12).

32.     Lamb, through Black Sheep, worked on the Badlands Job. *See infra* Part II.G, ¶¶

136 – 137.

**B**.     **Western's 2014 Restructuring -- The Purchase Agreement and
Non-Compete Clauses**

33.     In 2013, the owners of AF decided it would be advantageous to operate AF's

business through Western. AF was dissolved, its members were paid a cash distribution, and they

bought interests in Western, resulting in Western's restructuring in 2014. Arnold Tes., at 11:28 –

11:31 a.m.

34.     A *First Amended Operating Agreement of Western Chemical, L.L.C.,* effective as

of January 1, 2014, was executed and is admitted into evidence as Exhibit 8.

The Purchase Agreement and Birchell's Related Obligations

35.     Pursuant to an *Equity Interest Purchase Agreement* dated January 1, 2014 (the

"**Purchase Agreement**"), admitted into evidence as Exhibit 3, Arnold sold a portion of his 100%

interest in Western to Taylor, Birchell and each of the members of the Hall Family. Exh. 3

(Purchase Agreement); *see* Pretrial Order, ¶ 4.26; Exh. 2 (FFCL, Stipulated Facts, ¶ 9).

36.     Under the Purchase Agreement, Arnold retained a 24% interest in Western, the

Hall Family obtained a collective 26% interest from Arnold, Taylor obtained a 26% interest and

Birchell obtained a 24% interest (collectively, these persons are the "**Western Members**"). Exh.

3 (Purchase Agreement, Exh. A); *see* Pretrial Order, ¶ 4.26; Exh. 2 (FFCL, Stipulated Facts,

¶¶ 6, 9).

37.     The total purchase price Birchell agreed to pay Arnold for his 24% interest in

Western was $466,094.47. Pretrial Order, ¶ 4.26.

38.     Birchell financed his purchase as follows:

i.      Birchell paid $150,305.00 to Arnold concurrent with the signing and

closing of the Purchase Agreement. Pretrial Order, ¶ 4.26(a). This payment, or a part of

it, was Birchell's cash distribution from AF. Arnold Tes., at 11:32 a.m. and 1:57 p.m.;

Birchell Tes., at 10:29 a.m. and 3:34 p.m.

ii.     The balance of the purchase price was payable in five equal annual

installments, including interest, in the amount of $66,997.39 – due on March 31 of 2015,

2016, 2017, 2018 and 2019 – pursuant to a *Promissory Note* in the principal amount of

$315,789.47 (the "**Equity Purchase Note**"), admitted into evidence as Exhibit E.

Pretrial Order, ¶ 4.26(b).

iii.    The Purchase Agreement provided: "As additional security for each

[Equity Purchase Note], each Buyer will assign the after tax portion of any cash

distribution made to them by Company to the payment on their Note to [Arnold] until

their Note to [Arnold] is paid in full. ('**Assignment of Distributions**')." Pretrial Order, ¶

4.26(c) (quoting Exh. 3 (Purchase Agreement, ¶ 1.2)(emphasis added)).

iv.     Birchell's payment obligations under the Equity Purchase Note were

secured by a lien against his 24% membership interest in Western pursuant to an *Equity*

*Interest Pledge Agreement* (the "**Equity Pledge Agreement**"). Pretrial Order, ¶ 4.26(d).

<u>The Non-Compete Clauses</u>

39.    Article 6 of the Purchase Agreement contains provisions related to "Noncompetition and Confidential Information" (the "**Non-Compete Clauses**"). Exh. 3 (Purchase Agreement, p. 6); *see* Exh. 2 (FFCL, Stipulated Facts, ¶¶ 11-15).

40.    But for the Non-Compete Clauses, Arnold would not have sold his interest in Western, and Brad Hall and Cole Hall would not have provided capital. Exh. 2 (FFCL, Stipulated Facts, ¶ 10 and Trial Facts, ¶ 1).

41.    Birchell did not have an attorney review the Purchase Agreement prior to his execution of it and it is unclear what Birchell's understanding of the Non-Compete Clauses was at that time. Birchell Tes., at 10:22 – 10:25 a.m.

42.    Birchell read the entire Purchase Agreement, and he knew about the Non-Compete Clauses when he entered into the Agreement in 2014. Birchell did not remember detailed conversations about the Non-Compete Clauses at that time but he does recall the terms of the Purchase Agreement were presented to him, and it is agreed that the Non-Compete Clauses were discussed by at least some of the parties to the Purchase Agreement. Birchell Tes., at 10:22 – 10:26, 11:25 – 11:26 a.m.; *see* Arnold Tes., at 11:33, 11:35 a.m. and 1:25 p.m.[15]

43.    Birchell did not remember the Non-Compete Clauses in 2016 when he bid on the Badland Job or when he commenced work on the Badlands Job. Birchell Tes., at 11:26 – 11:28 a.m. The first time Birchell again became aware of the Non-Compete Clauses was after he employed an attorney to represent him in the State Court Lawsuit that was filed in 2017. *See*

---

[15] It is undisputed that prior to executing the Purchase Agreement the Western Members knew about Birchell's ownership and his work through BBOS. This work was not an issue until Birchell worked on the Badlands Job through BBOS. Cole Hall Tes., at 2:26 p.m.; Birchell Tes., at 10:33 a.m.

*infra* Part II.I ¶ 155. Birchell gave him documents and the attorney brought the Non-Compete

Clauses to his attention. Birchell Tes., at 11:25 – 11:27 a.m. and 1:27 p.m.

44.     Birchell breached the Non-Compete Clauses in 2016. Exhs. 1 (Judgment), 2

(FFCL).

### C.      Western's Post-Restructuring Business

#### KCl Business and Relevant Financing

45.     Western's financial statements establish that Western's primary businesses

between January 2014 and December 2017 involved the sale of KCl fluids, sales of chemicals,

and sales of acid. Exh. P (Financial Statements); *see also* Exh. 11 (Financial Statements); Arnold

Tes., at 11:37 – 11:48 a.m.

46.     Birchell dealt with KCl production and sales. Arnold contributed extensive

chemicals knowledge. Exh. 2 (FFCL, Stipulated Facts, ¶ 8).

47.     Cole Hall and Brad Hall provided financial capital for Western. Exh. 2 (FFCL,

Stipulated Facts, ¶ 8).

48.     Western purchased potash to produce KCl. BH Associates financed Western's

purchase of potash. Arnold Tes., at 11:54 – 11:55 a.m.; Cole Hall Tes., at 2:45 – 2:46 p.m.

49.     From 2014 through 2015, Western did substantial KCl business and derived

profits therefrom. Exh. P (financial statements); *see also* Exh. 11 (financial statements); Arnold

Tes., at 11:37 – 11:50 a.m.

50.     In 2016, work in the Uinta Basin's oil business decreased, and Western's KCl work

also decreased. Exh. P (Financial Statements); *see also* Exh. 11 (Financial Statements); Arnold

Tes., at 11:37, 11:40 – 11:42 a.m.; Cole Hall Tes., at 2:13 – 2:14 p.m.; Exh. 17 (Birchell 2018 Tr.,

p. 65:1 – 22).

## Birchell's Role at Western

51.    Birchell had substantial experience in connection with selling and supplying KCl and brine prior to his time with Western. Pretrial Order, ¶ 4.24; Exh. 2 (FFCL, Stipulated Facts, ¶ 8).

52.    Birchell's knowledge of mixing and pricing KCl was what he brought to Western. Pretrial Order, ¶ 4.25; Exh. 2 (FFCL, Stipulated Facts, ¶ 8).

53.    Birchell had a good reputation in the oil fields. He also had many personal business contacts relating to and arising from his experience and expertise selling, supplying and mixing KCl, brine and other fracking completing fluids. Arnold Tes., at 1:22 – 1:23 p.m.; Birchell Tes., at 10:02 – 10:04 a.m. These contacts included a professional relationship with Duncan and Badlands that pre-dated his work at Western. Arnold Tes., at 12:56 p.m.; Exh. 16 (Duncan Tr., at p. 132:13 – 19); Exh. 2 (FFCL, Stipulated Facts, ¶ 16 and Trial Facts, ¶ 3).

54.    In addition to being a Western Member, Birchell was a salaried employee of Western from approximately April 2014 through at least March 2016, during which time Western paid Birchell a salary of $10,000 per month. Pretrial Order, ¶ 4.27; *see* Exh. 2 (FFCL, Stipulated Facts, ¶ 6). He served as Western's KCl Operations Manager and worked as a sales representative, responsible for selling KCl, brine and other fracking completion fluids. Exh. 2 (FFCL, Stipulated Facts, ¶ 6).

55.    During his employment with Western, Birchell's role focused on utilizing his experience with and business contacts related to KCl to bring business to Western, and Birchell was primarily responsible for all aspects of Western's KCl business. Pretrial Order, ¶ 4.28; *see* Exh. 2 (FFCL, Stipulated Facts, ¶ 6).

56.     Although Birchell's experience mixing, pricing, selling and supplying KCl was his primary focus, he also supported the other areas of Western's business, including maintaining customer relationships and obtaining new business. Birchell Tes., at 10:51 a.m. and 1:12 p.m. Exh. 17 (Birchell 2018 Tr., p. 43:4 – 12); *see* Exh. 2 (FFCL, Stipulated Facts, ¶ 6).

57.     Birchell participated in regular (weekly scheduled) meetings with Arnold, Cole Hall, and Taylor to discuss Western's business, including the status of current jobs and the prospects for future work. Pretrial Order, ¶ 4.41; *see* Exh. 2 (FFCL, Stipulated Facts, ¶ 6). Finances and the financial condition of the company were also discussed. Arnold Tes., at 11:55 – 11:56 a.m.

58.     Birchell, while an owner and employee of Western, had confidential information about Western regarding its plans, customers, financial performance, and products. Exh. 2 (FFCL, Stipulated Facts, ¶ 7).

**D.     Western's Financial Difficulties**

General Financial Issues and the BH Associates Note

59.     Western was profitable in 2014 and continued to be so through at least part of 2015. Defendant's Exhs. P, Q; Arnold Tes., at 11:37 a.m.; Exh. 20 (Birchell 2021 Tr., pp. 157:8 – 158:2).

60.     Western had a continuing accruing debt to BH Associates related to Western's purchase of potash. Arnold Tes., at 11:54 a.m.; Cole Hall Tes., at 2:45 – 2:46 p.m. Because of Western's failure to live within certain financial agreements, a *Promissory Note*, a copy of which was admitted into evidence at Exhibit 4 (the "**BH Associates Note**"), was executed in or around December 2015. Cole Hall Tes., at 2:46 p.m. Western committed to pay BH Associates the

principal sum of $1,212,677.23. Exh. 4 (BH Associates Note). Arnold, Taylor and Birchell

personally guaranteed Western's debt under the BH Associates Note. *Id.*, at p. 3.

61.    Western experienced cash flow difficulties in January 2016. Pretrial Order, ¶ 4.29;

Exhs. P, Q (Financial Statements).

62.    Western was "cash poor" and its line of credit was "maxed out" in February or

March 2016. Arnold Tes., at 11:40 a.m.; Cole Hall Tes., at 2:09 – 2:13 p.m.; *see* Exh. 20 (Birchell

2021 Tr., pp. 159:14 – 160:2).  Its debts at this time were more than $4,000,000. Exh. Q; Arnold

Tes., at 11:54 a.m.; Cole Hall Tes., at 2:13 p.m.

63.    Western's cash flow issues resulted from a downturn in the price of oil, the cost of

certain capital expenditures made by Western, and monies owed to Zions Bank as well as to BH

Associates for potash purchases. Arnold Tes., at 11:54 – 11:55 a.m.; Cole Hall Tes., at 2:11- 2:14

p.m.

64.    Western did not make a cash distribution to the Western Members in 2016.

Pretrial Order, ¶ 4.30.

65.    As of May 2016, Western required additional capital to continue its business

operations. Pretrial Order, ¶ 4.34.

<u>Communications Regarding Western's Financial Difficulties</u>

66.    In or about late December 2015 or early January 2016, Arnold informed Birchell

and Taylor that there was a real chance that Western would not be able to continue as a going

concern. Arnold Tes., at 12:03 – 12:04 p.m.; Birchell Tes., at 10:58 a.m. and 3:06 – 3:08 p.m.

These meetings continued through at least March 2016. Arnold Tes., at 12:02 – 12:03 p.m.

67.    At an annual meeting held on January 28, 2016, at which Birchell was present, Western's financial condition was discussed. Exh. 6 (Meeting Minutes); Cole Hall Tes., at 2:21 – 2:22 p.m.

68.    In January or February 2016 and through March 2016, there were discussions amongst the Western Members about financial options. Arnold Tes., at 12:02 – 12:03 p.m.; Cole Hall Tes., at 3:13 p.m.; Birchell Tes., at 11:00 a.m. and 12:51 – 12:52, 3:08 p.m. They talked about "how to keep things going." Arnold Tes., at 12:03 p.m. There were also discussions of the company filing bankruptcy or liquidating some assets. Arnold Tes., at 1:36 – 1:37 p.m.; Cole Hall Tes., at 2:22 – 2:23, 3:13 – 3:14 p.m.

69.    In light of the financial distress being experienced in 2016 "everything was for sale" as Western was struggling as a company and a liquidation was considered. Arnold Tes., at 12:03 – 12:04 p.m. There were discussions between at least Arnold, Taylor and/or Birchell during this time about Western selling its KCl equipment or business. Birchell and, perhaps Taylor, indicated an interest in buying equipment. Arnold Tes., at 12:03 – 12:05 p.m., 1:31 – 1:32 p.m.; Birchell Tes., at 10:31 – 10:32, 10:42 – 10:43, 10:47 a.m. Ultimately, Birchell did not buy Western's KCl equipment. He thought the price offered by Arnold was too high and he did not need the equipment or Western to do KCl work. Birchell Tes., at 10:04 – 10:05 and 10:47 – 10:49 a.m.

70.    Birchell, Taylor and Arnold went to Idaho to discuss finances with BH Associates and Zions Bank. Arnold Tes., at 12:06 – 12:07 p.m.

71.    Neither Western nor Arnold brought up the Non-Compete Clauses during this time. Arnold states he thought that since the company was in a state of financial distress, the Non-Compete Clauses were not something necessary to bring up. Arnold Tes., at 12:21 – 12:22 p.m.

<u>Salary Termination</u>

72.     As a result of Western's financial difficulty, salaries were cut or terminated. Birchell and Taylor's salaries were cut in full, and Arnold's salary was cut in half. Arnold Tes., at 12:14 p.m.; Birchell Tes., at 10:59 a.m.

73.     Birchell's salary ended in March or April 2016. Pretrial Order, ¶¶ 4.27 n.1, 4.32.

74.     Birchell initially believed his salary was being suspended temporarily. He was not happy but understood the business decision. He felt obligated to Western employees and hoped that giving up his salary temporarily would keep the company going. Birchell later realized there would be no funds to pay his salary and he decided to leave Western. Birchell Tes., at 1:19 – 1:20, 3:10 – 3:14 p.m.

75.     Birchell's salary was eliminated even though KCl sales were a significant source of Western's business, and Birchell was the person at Western with the primary contacts in the KCl business. Birchell Tes., at 10:00 – 10:03, 10:59 – 11:01 a.m. (discussing Exh. 17 (Birchell 2018 Tr., p. 82:3 – 8)).

76.     At some point, Birchell urged Western not to cut off his salary, because his personal relationship with Duncan could help bring future KCl work to Western. Arnold Tes., at 1:46 – 1:47 p.m.; Birchell Tes., at 3:23 p.m. Birchell's KCl connections and knowledge of the work, and the potential Badlands Job did not change Arnold's mind about cutting Birchell's salary or, as discussed below, terminating his employment. Arnold Tes., at 1:47 p.m. Birchell stated that Arnold told him the work was contingent and Western could not rely on it. Birchell had the impression that Arnold was not interested in the Badlands Job. Birchell Tes., at 3:22 – 3:24 p.m.

77.     Western did not bring up the Non-Compete Clauses at this time. The company
was struggling, and Arnold did not pursue the issue. Arnold Tes., at 12:22 – 12:23 p.m.

<u>Birchell's Understanding of Western's Continuation of KCl Business</u>

78.     Unless the business was purchased, Arnold and the Hall Family had the intent for
Western to continue doing the KCl business because it was profitable and approximately 60% of
Western's gross revenue, and Arnold never told Birchell Western was out of the KCl business.
Arnold Tes., at 12:25 – 12:26 p.m.; Cole Hall Tes., at 3:21 – 3:22 p.m.

79.     Regardless of what was communicated to him, Birchell credibly testified that it
was his belief that Western was not interested in or was out of the KCl business in 2016 based on
(i) the decline in KCl work commencing in early 2016; (ii) Western's procurement of certain
larger production chemical contracts during this time; and (iii) the fact that Western terminated
his salary and then his employment when he was the primary person obtaining and executing KCl
work. Birchell Tes., at 10:43 – 10:47, 11:00 – 11:02 a.m. and 12:52 – 12:53 p.m.; *see id.,* at
10:02 – 10:03 a.m. On this last point, Birchell testified that he "thought personally well okay
they're not going to they don't want to do anymore KCl work." *Id.,* at 11:02 a.m.

**E.      Birchell's Equity Purchase Note Default, Loss of Membership Interest and
          Employment Termination**

<u>Birchell's Default Under the Equity Purchase Note</u>

80.     Western made a distribution to the Western Members in 2015. Pursuant to the
Purchase Agreement's Assignment of Distributions provisions, Birchell paid Arnold $66,997.39
as required under the Equity Purchase Note. Pretrial Order, ¶ 4.26(e); *see* Exh. E (Equity
Purchase Note, ¶ 2).

81.     Western did not make a distribution to Western Members in 2016. Pretrial Order,
¶ 4.30. Accordingly, the Assignment of Distributions provided for in the Purchase Agreement

could not be effectuated. *See* Exh. 3 (Purchase Agreement, ¶ 1.2). Birchell did not pay Arnold

the second installment due under the Equity Purchase Note on March 31, 2016. Pretrial Order,

¶ 4.31;[16] Exh. 2 (FFCL, Stipulated Facts, ¶ 19); *see* Exh. E (Equity Purchase Note, ¶ 2).

82.    Birchell asked Arnold for time to consider issues related to the Equity Purchase

Note and to extend the deadline for his second installment payment under the Equity Purchase

Note. Arnold Tes., at 11:59 a.m. Arnold initially suggested that he would "work with" Birchell,

but Arnold never granted a formal extension and did not forbear. Arnold Tes., at 11:59 a.m. and

12:01 p.m.; Exh. 17 (Birchell 2018 Tr., p. 101:5 – 17).

83.    On or about May 24, 2016, Arnold delivered to Birchell a written *Notice of*

*Default* under the Equity Purchase Note and the Equity Pledge Agreement. Pretrial Order, ¶ 4.39;

Exh. 2 (FFCL, Stipulated Facts, ¶ 19); Arnold Tes., at 12:02 p.m. Birchell told Arnold at that time

he was not sure he wanted to put money into a company that was going to fail. *Id*.

84.    Birchell did not cure the default and, pursuant to a *Notice of Default and Option*

*to Assume* dated June 9, 2016 (the "**Note Default Notice**"), admitted into evidence as Exhibit 9,

Birchell was notified of his default under the Equity Purchase Note and his option to assume the

pro rata share of his membership interest in Western in accordance with the Equity Pledge

Agreement. Exh. 9 (Note Default Notice, ¶¶ 15.0, 17.0). There was no evidence that this option

was exercised, and the parties stipulate that Birchell's membership interest in Western was

foreclosed by Arnold and terminated as of June 6, 2016. Pretrial Order, ¶ 4.40; *see* Exh. 2

(FFCL, Stipulated Facts, ¶ 19 (interest was forfeited)).

---

[16] The Pretrial Order states a date of March 31, 2015. Based on the evidence this appears to have been an error.

<u>Birchell's Failure to Meet the Capital Call</u>

85.     In or before May 2016, Western made a capital call upon the Western Members. Pretrial Order, ¶ 4.35.

86.     On May 20, 2016, the Western Members, including Birchell, agreed to the capital call. Exh. R (Consent in Lieu of A Meeting of the Members of Western Chemical Company, L.L.C. ("**Consent in Lieu**")). This was necessary to avoid dissolution of Western. Arnold Tes., at 12:08 p.m.

87.      Arnold answered the capital call and contributed $150,000 of additional capital to Western. Pretrial Order, ¶ 4.35; *see* Exh. R (Consent in Lieu, ¶¶ C, 3, 5).

88.     Birchell did not answer the capital call. Other than Arnold, neither did the other Western Members. Pretrial Order, ¶ 4.37. It was agreed that the other Western Members had "decline[d] to make any additional Capital Contributions to the Company at this time." Exh. R (Consent in Lieu, ¶ 2).

89.     It was also agreed that "upon receipt of Arnold's Additional Capital Contribution, the Members' Capital Interest in the Company shall be adjusted and maintained according to the terms and conditions of the Operating Agreement." Exh. R. (Consent in Lieu, ¶ 6).

90.     Birchell and Taylor were informed that, as a consequence of not meeting the capital call, their membership interests in Western had been diluted. Pretrial Order, ¶ 4.38.

<u>Termination of Birchell's Employment</u>

91.     When his salary was cut, Birchell stopped working. Birchell Tes., at 1:20 p.m. Birchell testified that about mid-May 2016, he told Arnold that "[y]ou won't be seeing me around much anymore." Exh. 17 (Birchell 2018 Tr., p. 86:12 – 17).

92.     Western formally notified Birchell that his employment was terminated on June 9,

2016. Pretrial Order, ¶ 4.33; *see* Exh. D (letter dated June 9, 2016 from Western to Birchell).

This was the same day that he was presented with the Note Default Notice.

93.     Birchell was not reminded about the Non-Compete Clauses when he stopped

working at Western or when his employment was terminated. *See* Birchell Tes., at 3:29 p.m.; *see

also* Exh. D.[17]

94.     At the time he left the company, Birchell knew Western was in bad financial

shape, but after he left the company, he did not know the financial condition of the company

whether good or bad. Birchell Tes., at 10:16, 10:30 a.m.

95.     At the time that his employment was terminated, Birchell had three children and

he was the sole provider for his family. Birchell Tes., at 3:13 – 3:14 p.m. Although he had some

income from BBOS, it was not enough to provide for his family.

96.     Birchell did not have a plan at this time and was trying to figure out how to get

by. Birchell Tes., at 3:15 – 3:21 p.m.

**F.      The Parties' Beliefs at the Time Birchell Left Western**

97.     Between January and April or May 2016 there were difficult discussions between

Birchell and Arnold. Birchell had long thought that Western was mismanaged because other

owners were not engaged, and Arnold was neglecting his duties. Birchell Tes., at 10:15 – 10:16,

10:49 – 10:50, 11:02 – 11:03 a.m. and 1:33 – 11:35 p.m.; Exh. 17 (Birchell 2018 Tr., pp. 71 –

73:1 – 11).

---

[17] Plaintiffs objected to this Exhibit because it was unclear whether Exh. D was ever delivered to Birchell. But, the
parties agree that Birchell's employment was terminated on June 9, 2016. Pretrial Order, ¶ 4.33. If the letter was
delivered, it does not discuss the Non-Compete Clauses.

98.     Birchell did not make his 2016 payment under the Equity Purchase Note knowing
his ownership would be forfeited, because at least in part he "decided I didn't want to be a part of
the company anymore, so I chose not to pay that." Exh. 17 (Birchell 2018 Tr., p. 88:12 – 14); *see
id*., at p. 88:6 – 11; *see* Exh. 20 (Birchell 2021 Tr., p. 161:1 – 13). He did not like the way his
partners ran the business and he did not "like their character. . . . [and he] didn't care to be
associated with them anymore." Exh. 17 (Birchell 2018 Tr., p. 90:18 – 22). Birchell stated he
knew "there was some bad feelings there," *id*., at p. 91:2, with Arnold and Cole Hall. *Id*., at p.
91:6-13.

99.     Although Arnold decided not to work with Birchell, other Western Members were
given additional time to make the payment under the Equity Purchase Note. Arnold Tes., at
12:01 p.m.; Cole Hall Tes., at 2:34 p.m.

100.     Birchell "had suspicions" that "the company was sabotaged by certain members
of the company to force out other partners." Exh. 17 (Birchell 2018 Tr., p. 99:18 – 23). Those
certain members were the "Halls, Cole Hall, and Joe Arnold." *Id*., at p. 100:5. They knew of his
financial status, and yet Arnold would not forbear on the Equity Purchase Note. *Id*., at pp. 99:25
– 100:18.

101.     Birchell was also upset that he would essentially need to come up with over
$200,000 to keep his interest in the company at a time when his salary had been cut. He was not
happy and was disappointed about the situation, but he decided he was just going to move on.
Birchell Tes., at 3:12 – 3:14 p.m.

102.     Arnold believed their friendship ended when Birchell left Western. Arnold Tes.,
at 1:19 – 1:22 p.m.

103.    Although Birchell did not want to be associated with Arnold after he was let go, he did not hate him or want to harm him or Western. He had run into Arnold since that time and had not been confrontational. Birchell Tes., at 12:48 – 12:51 p.m. Birchell also did not hate the Hall Family or want to hurt them. *Id.*

104.    Birchell did not want to take Western down when he left the company. He had friends at Western when he left, and he still sees some of his former Western workers. He was glad they had jobs. Birchell Tes., at 3:15 – 3:16, 3:20 p.m. He never told anyone not to work with Western and did not bad mouth Arnold or anyone else. *Id.*, at 3:04 – 3:05 p.m.

105.    In approximately June 2016, Birchell and Taylor had a meeting with Arnold and Birchell and/or Taylor let Arnold know that they believed he had mismanaged Western. There were threats that a forensic accountant would be employed and legal action taken. Arnold Tes., at 1:55 p.m.; Birchell Tes., at 1:14 – 1:16, 1:33 – 1:34 p.m.

## G.    The Badlands Opportunity and the Badlands Job

### The Badlands Opportunity

106.    Birchell was the key representative of Western who had contact with Badland representatives, and he was paid by Western while he was employed to develop Western's relationship with Badlands. Exh. 2 (FFCL, Stipulated Facts, ¶¶ 6, 18).

107.    In approximately January, February or March 2016, Duncan, on behalf of Badlands, called Birchell at Western about a potential future opportunity to sell and supply KCl to Badlands in connection with a potential fracking project defined above as the "**Badlands Job**" (the "**Badlands Opportunity**"). Pretrial Order, ¶ 4.42 (in or before March 2016); Birchell Tes., at 10:06 a.m. and 12:55, 12:59 p.m.; *see* Exh. 2 (FFCL, Stipulated Facts, ¶ 16); Exh. 17 (Birchell 2018 Tr., p. 84).

108.     Duncan asked Birchell on that call about pricing KCl for the Badlands Opportunity, indicating that the job would not start until the fall or winter of 2016. Birchell did not want to give him a price because of the fluctuating price of materials but he told Duncan that when the Opportunity was more certain Duncan should touch base again. Duncan told him he also planned to talk to other KCl suppliers. Birchell Tes., at 12:55 – 12:59 p.m.; *see* Exh. 2 (FFCL, Stipulated Facts, ¶ 16) (Birchell was "invited" to provide pricing).

109.     Duncan did not call Birchell again about the Badlands Opportunity while Birchell was at Western. But, through at least April 2016, Birchell checked in with Duncan a few times after Duncan's initial call to determine the status of the Badlands Opportunity in hopes of getting work for Western. Birchell Tes., at 12:58 – 1:01 p.m.; Exh. 2 (FFCL, Stipulated Facts, ¶ 18). Birchell never talked pricing with Duncan while he was at Western. Birchell Tes., at 1:03 – 1:04 p.m.

110.     In January or February 2016, Birchell informed Western about the Badlands Opportunity and gave reports during later staff meetings that the Badlands Opportunity would start in the fall. Birchell Tes., at 12:59 – 1:00 p.m.; Exh. 17 (Birchell 2018 Tr., p. 83:7-20); Exh. 2 (FFCL, Stipulated Facts, ¶ 18).

111.     Birchell typically made very positive reports about the Badlands Opportunity in the meetings, and the expectation, based on his reports, was that the deal would come to fruition. Exh. 2 (FFCL, Stipulated Facts, ¶ 18).

112.     Birchell raised the Badlands Opportunity with Western at the time that his salary was cut because he wanted to remind the company of the potential for better days ahead. In so doing he did not say the work was guaranteed, but rather that he liked Western's chances in getting the work. Birchell Tes., at 1:00 – 1:01, 1:03 p.m.

113.     Birchell understood at that time that Western was not interested in the work. *See supra,* Part II.D.

Bid for the Badlands Job

114.     In the middle of July 2016, after Birchell's employment at Western had been terminated, Birchell and Duncan again discussed the Badlands Opportunity. Duncan told Birchell that there would be work, referred to herein as the "**Badlands Job**." Birchell Tes., at 1:01 – 1:03 p.m.; *see* Exh. 16 (Duncan Tr., p. 138:10 – 15).

115.     Birchell made a proposal to Duncan to do the KCl work on the Badlands Job in mid or late July 2016. Birchell Tes., at 3:30 – 3:31 p.m.; Exh. 14 (Jensen Tr., pp. 21:16 – 17, 24:23 – 25:5); *see* Exh. 16 (Duncan Tr., p. 139:6 – 13).

116.     Badlands, through Duncan, did not require or request any formal bids, or enter into any formal agreements, in connection with the Badlands Job. Exh. 2 (FFCL, Trial Facts, ¶ 4). This was not necessarily unusual. Arnold Tes., at 1:52 – 1:53 p.m.

117.     Birchell presented Duncan with a proposal that looked like it would save trucking and time, including based on the on-site mixing. Because he was busy, Duncan did not talk to other suppliers and he "just went with" Birchell's bid. Exh. 16 (Duncan Tr., p. 133:22); *see id.,* at p. 133:7 – 22; Exh. 2 (FFCL, Trial Facts, ¶¶ 6 – 8). If the Badlands Opportunity had been bid, Badlands would have considered all bids based on equipment, previous work, and price, and Western would have been able to do the work in the same manner proposed by Birchell's group. Exh. 2 (FFCL, Trial Facts, ¶¶ 6, 8).

118.     Birchell credibly testified numerous times that he did not remember the Non-Compete Clauses in 2016 when he made a proposal to Duncan to do the Badlands Job. Birchell Tes., at 11:25 – 11:26 a.m. and 3:29 p.m.

119.    Birchell did not believe he was competing with Western when he worked to obtain the KCl work for the Badlands Job. Birchell Tes., at 11:25 – 11:26 a.m.

120.    Birchell obtained the Badlands Job to support his family. Birchell Tes., 3:18 p.m.; *see* Andrelee Tes., at 4:00 – 4:06 p.m.

121.    Birchell's family was "running on fumes." Birchell Tes., 3:17 p.m. They had significant debts, credit cards were maxed out, Andrelee was talking about going back to work, the family sold a truck and lived off the proceeds and Birchell was looking for anything he could do to get by. *Id.*, at 3:17 – 3:19 p.m.; *see* Andrelee Tes., at 4:01 – 4:04 p.m. KCl was his expertise, and he thought he had the right to use that expertise to provide for himself. He was "not trying to take anyone out or have retribution towards . . . other people." Birchell Tes*.,* at 3:19 – 3:21 p.m. His "mindset" was that "I need to find something . . .." and getting work from Badlands would get him by until he found something more permanent. *Id.*, at 3:19 – 3:20 p.m. Birchell said at that point there was "nothing I could do" about the Western issues and he was just trying to move on. *Id.*, at 3:21 p.m.

### Birchell's Collaboration with Black Sheep/Lamb and DJ Oilfield/Jensen

122.    Lamb contacted Birchell in June or July 2016 because he thought Birchell was still working at Western and he was hoping his company, Black Sheep, could do hauling work for Western as it had in the past. Birchell informed Lamb that he was no longer with Western. It was at that time that Lamb and Birchell talked about pursing their own avenues of doing KCl business. Exh. 15 (Lamb Tr.*,* pp. 11:10 – 12:19, 13:9 – 20, 15:1 – 22).

123.    Birchell informed Lamb at that time of the Badlands Opportunity. They agreed in late July or August 2016 to make a bid and spilt the profits. This included Lamb's father who was a principal in Black Sheep. Birchell Tes., at 1:01 – 1:02, 3:16, 3:25 p.m.; Exh. 15 (Lamb Tr., pp.

11:4 – 12:11, 13:9 – 20, 15:15 – 22, 16:10 – 23, 24:6 – 17). Lamb made the deal not knowing

what Birchell's relationship with Duncan was at the time. *Id.*, at p. 29:8 – 23.

124.     Birchell's primary role was pricing the bid to Badlands and designing the tanks

and other equipment needed for mixing KCl. It was also agreed that Birchell would assist in

mixing KCl. Exh. 2 (FFCL, Stipulated Facts, ¶ 28); Exh 15 (Lamb Tr., p. 23:5 – 16).

125.     Neither BBOS nor Black Sheep had an MSA with Badlands. Sometime in mid-

July, mid-August or early September 2016, after Birchell had obtained the KCl work for the

Badlands Job, it was agreed that DJ Oilfield's MSA with Badlands would be used to bill

Badlands for the KCl work that Badlands had awarded to Birchell and Lamb. Jensen Tr., p. 25:1

– 13 (mid-July); Exh. 15 (Lamb Tr., pp. 18:17 – 19:6, 28:12 – 16 (mid-August or early

September); Birchell Tes., 11:14 – 11:15 a.m. and 3:24 – 3:27 p.m. (mid-September); Exh. 2

(FFCL, Stipulated Facts, ¶¶ 25, 33 – 34). Birchell states he was not involved in getting Jensen

involved in the KCl work. Birchell Tes., at 3:26 p.m.

126.     DJ Oilfield had already been engaged by Badlands to do flowback testing, and

Jensen was not involved in obtaining the KCl work for Birchell. Birchell Tes., at 3:24 – 3:25

p.m.; Exh. 14 (Jensen Tr. at, pp. 20:7 – 10, 21:2 – 15); Pretrial Order ¶ 4.43;[18] *see* Exh. 2 (FFCL,

Stipulated Facts, ¶ 33).

127.     Jensen, on behalf of DJ Oilfield, Birchell and Lamb made a verbal agreement that

Jensen would be paid 25% of the KCl work net profits for use of DJ Oilfield's MSA, for billing

---

[18]Jensen says that he left Western's employment in mid-July before he went to a "pre-frac" meeting at Badlands.
Exh. 14 (Jensen Tr., pp. 19:12 – 24, 20:3 – 6 and 14 –15, 21:2 – 6). Yet, Jensen was still drawing a salary from
Western through September 15, 2016. Exh. 12 (Western Pay Register). Arnold recalled Jensen telling him he was
leaving for other opportunities in September 2016. Arnold Tes., at 12:29 – 12:30 p.m. Regardless, the only evidence
is that Jensen and Birchell did not work together to get work on the Badlands Job.

Badlands, mixing KCl, and lining up trucking. Exh. 14 (Jensen Tr., pp. 25:14 –15, 27:16 – 25, 28:1 – 3, 29:1 – 7, 22 – 25, 30:1 – 2); Exh. 15 (Lamb Tr., p. 18:21 – 23, 27:13 – 25).

<u>Western and the Badlands Job</u>

128.     Jensen was an account manager for Western and he provided Arnold information about accounts. Arnold Tes., at 12:19 p.m. Jensen informed Arnold that Birchell was doing the KCl work on the Badlands Job. Arnold Tes., at 1:50 p.m.

129.     After Arnold heard that the KCl work was awarded to Birchell, Arnold had a meeting with Duncan informing him that Western could supply KCl. This conversation took place a "couple of months" after the work on the Badlands Job had started. Exh. 2 (FFCL, Stipulated Facts, ¶ 47 & Trial Facts, ¶¶ 2, 7); Exh. 16 (Duncan Tr., pp. 134:13-135:4); Arnold Tes., at 12:20 – 12:22 p.m.[19] Arnold gave Duncan pricing for KCl work, and Western was awarded work. *Id.*; *see* Exh. 2 (FFCL, Stipulated Facts, Trial Facts, ¶¶ 7 – 8)

130.     Although Arnold claims he knew about the Non-Compete Clauses at this time, Arnold did not contact Birchell or give Birchell notice that he was violating the Non-Compete Clauses when he learned that Birchell was doing the KCl work on the Badlands Job. Arnold Tes., at 12:22 – 12: 23, 1:50, 1:58 – 1:59 p.m.[20]

---

[19] The State Court determined that Western was ready, willing and able to complete the entire Badlands Job, including by providing "on-site" mixing. Exh. 2 (FFCL, Trial Facts, ¶ 2). If Birchell had not taken the Badlands deal from Western, Duncan would have directed the same work to Western. Duncan liked working with Western and it was the only other supplier that could have provided on-site mixing. *Id.*, at ¶¶ 5, 8 – 11. While relevant to the issue of breach of the Non-Compete Clauses and damages as a result, this fact is not relevant to the issue before this Court.

[20] Much is made of the fact that Cole Hall, as a Rule 30(b)(6) witness for Western, did not know of the Non-Compete Clauses when the Lawsuit was filed – the first complaint did not include a cause of action for breach of the Non-Compete Clauses. Cole Hall Tes., at 2:49 – 2:50 p.m. He testified that none of the Western Members knew of the Non-Compete Clauses at the time that the state court action was filed. *Id.*, at 3:10 p.m.

<u>KCl Work on the Badlands Job</u>

131.     Duncan tried to spread the Badlands Job KCl work around to multiple companies, including Western. Exh. 2 (FFCL, Trial Facts, ¶¶ 7 – 8).

132.     Birchell's group, through DJ Oilfield, supplied the largest portion of KCl for the Badlands Job. Exh. 2 (FFCL, Stipulated Facts, ¶¶ 32, 47 and Trial Facts, ¶ 8).

133.     Birchell's work on the Badlands Job was done through his entity BBOS that had previously not engaged in chemical sales. Exh. 2 (FFCL, Stipulated Facts, ¶¶ 22 – 23, 25).

134.     By August 2016, Lamb and Birchell had obtained equipment and materials to produce KCl and were actively working on the Badlands Job. Birchell Tes., at 11:15 – 11:16 a.m. and 3:30 p.m.

135.     DJ Oilfield sold and supplied KCl for the Badlands Job pursuant to its MSA beginning no later than mid-August 2016 or September 2016. Pretrial Order, ¶ 4.44 (September); Exh. 2 (FFCL, Stipulated Facts, ¶ 24) (no-later than mid-August); Exh. 16 (Duncan Tr., p. 139:2 – 8 (fracking commenced in the fall)); *see* Exh. 2 (FFCL, Stipulated Facts, ¶ 25 (BBOS used DJ Oilfield MSA)).

136.     Birchell, Lamb, and Jensen, through their respective entities, worked together to produce and supply KCl on the Badlands Job. Exh. 2 (FFCL, Stipulated Facts, ¶¶ 28 – 30).

137.     Birchell's physical work on the Badlands Job involved assisting in mixing KCl. Lamb did most of the physical work which involved loading, delivering and mixing product. Jensen performed billing and assisted in producing and shipping the KCl. Exh. 2 (FFCL, Stipulated Facts, ¶¶ 28 – 30).

138.     As part of their work on the Badlands Job, Jensen reported KCl sales to Birchell by text, and the two of them would banter by text about their impressions and earnings. They

also communicated about the job logistics and payments from Badlands. Exh. 2 (FFCL, Stipulated Facts, ¶¶ 41 – 46).

139.    Birchell did not remember the Non-Compete Clauses in the Purchase Agreement when he was doing KCl work on the Badlands Job. Birchell Tes., at 3:29 p.m.

140.    Birchell credibly testified that he did not do the Badlands Job because he wanted to hurt the Plaintiffs. He was just looking forward and trying to support his family. Birchell Tes., at 3:30 – 3:21 p.m.

Compensation for the Badlands Job

141.    Badlands paid DJ Oilfield over $1.5 million for the KCl work on the Badlands Job. Exh. 14 (Jensen Tr., pp. 83:13 – 84:4.); *see* Exh. 2 (FFCL, Stipulated Facts, ¶¶ 34 – 36).

142.    Birchell, Jensen and Lamb met to determine how to allocate the funds paid to DJ Oilfield. Exh. 2 (FFCL, Stipulated Facts, ¶¶ 38 – 39).

143.    DJ Oilfield distributed over $1.4 million to Black Sheep. Exh. 2 (FFCL, Stipulated Facts, ¶ 37).

144.    In December 2016, Birchell, through BBOS, received $96,000 from his participation in the Badlands Job. Exh. 2 (FFCL, Stipulated Facts, ¶¶ 31, 40). Lamb and his father also received $96,000 each. Exh. 2 (FFCL, Stipulated Facts, ¶ 31); *see id*., ¶¶ 37 - 39.

**H.    Brad Hall Issues**

145.    Brad Hall is a principal of BH Associates and one of the Western Members. Brad Hall Tes., at 3:51 p.m.

146.    Brad Hall was serving on a mission for his church in Mexico when the Purchase Agreement was executed, and Logan Hall executed it for him by way of power of attorney. *See* Exh. 3 (Purchase Agreement, signature page); Cole Hall Tes., at 2:27 p.m. Brad Hall did not

know about the Purchase Agreement until 2016 when he returned from his church mission. Exh.

3 (Purchase Agreement, p. 15); Brad Hall Tes., at 3:29 – 3:31 p.m.; Exh. 8 (Operating

Agreement, p. 24 (executed through Power of Attorney)); Cole Hall Tes., at 2:27 p.m.

147.     Brad Hall returned from his church mission in June 2016. Brad Hall Tes., at 3:24

pm.; Birchell Tes., at 9:58 a.m.

148.     Sometime after his return, in the summer of 2016, Brad Hall learned about

Western's financial challenges. Brad Hall Tes., at 3:32 – 3:33 p.m.

149.     On or about August 9, 2016, Brad Hall went to Western's facilities and met with

employees to see what he could do to help improve Western's plight. Brad Hall Tes., at 3:33 –

3:34 p.m.

150.     Thereafter there were communications between Brad Hall and Birchell and,

sometimes, Taylor. The timing and nature of the communications is in dispute.

    i.     Birchell recalls: (a) A telephone call with Brad Hall on August 16, 2016

that he took with Andrelee present; (b) a telephone call with Brad Hall on September 8

or 9, 2016, prior to an in-person meeting with Brad Hall; (c) an in-person meeting with

Brad Hall and Taylor at a hotel on September 8 or 9, 2016 (the "**Hotel Meeting**"); and

(d) a telephone call with Brad Hall a few weeks after the Hotel Meeting. Birchell Tes., at

10:03 – 10:16, 11:04 – 11:06, 11:17 – 11:26 a.m.; Andrelee Tes., at 4:06 p.m.

    ii.     Brad Hall recalls: (a) his first discussion with Birchell was in person at the

Hotel Meeting when he met with Birchell and Taylor; and (b) a telephone call with

Birchell later in September 2016 after the Hotel Meeting. Brad Hall Tes., 3:28, 3:35,

3:37 – 3:39 p.m.

151.    Regardless of when and how these communications were made or the exact content of the communications, the following is relevant:

i.    The communications commenced after Birchell's proposal to do the Badlands Job had been accepted and he and Lamb had commenced work. Birchell Tes., at 11:14 – 11:16 a.m. and 1:26 p.m.

ii.    The communications were initiated by Brad Hall for the purpose of making a proposal to Birchell and Taylor to relieve them of their obligations for Western's debts, including their respective guaranties of the BH Associates Note, in exchange for agreeing not to compete against Western. Brad Hall Tes., at 3:36 p.m.

iii.    Conversations focused on the money Western owed to BH Associates Note, the individual guaranties, and a contract that Brad Hall would provide. Birchell understood this included a non-compete agreement but he thought the meeting focused on the money owed to BH Associates. Birchell Tes., at 10:06 – 10:09, 10:14 – 10:15, 11:11, 11:20 – 11:21 a.m. and 3:33 p.m. At the Hotel Meeting, no documents were exchanged and terms were not discussed. Brad Hall Tes., at 3:36 – 3:47 p.m.; Exh. 19 (Birchell 2023 Tr., pp. 91:22 – 92:1); Birchell Tes., at 10:07, 10:14 – 10:15, 11:20 – 11:21 a.m.

iv.    Brad Hall told Birchell that he would "pursue this to the end" or that he would "pursue this to try to resolve the problems of Western Chemical." Brad Hall Tes., at 3:33 – 3:45 p.m.; Birchell Tes., at 11:21 a.m. Birchell believed this meant that Brad Hall "would take me until I did not have anything." *Id*.

   v.  Birchell was angry with Brad Hall and believed he had been threatened. Birchell Tes., at 10:03 – 10:12, 11:11 – 11:12, 11:17 – 11:18 a.m. The threats were not related to competing against Western. *Id*., at 3:33 p.m.

   vi.  The communications often were contentious, and Birchell swore at Brad Hall at least one time. Brad Hall Tes., at 3:36 – 3:37 p.m.; Birchell Tes., at 10:13, 11:06, 11:13 a.m.

   vii.  The Birchells knew that Brad Hall had means and they were scared for their family and financial security. Birchell Tes., at 10:15, 11:12 – 11:17 a.m.; Andrelee Tes., at 4:07 p.m.

   viii.  In late September 2016, Brad Hall provided a *Guaranty Release, Debt Release, and Restrictive Convent Agreement*, admitted into evidence as Exh. A, to Birchell. Brad Hall Tes., at 3:50 – 3:53 p.m. Birchell did not sign the Agreement because he thought it was too broad and he would not be able to work in the oilfields in Utah anymore. Birchell Tes., at 11: 24 a.m.

   ix.  Birchell did not think he was harming anyone by doing KCl work even after these interactions. Birchell Tes., at 10:04 a.m.

152.  After his communications with Brad Hall, Birchell may have concealed his involvement in the Badlands Job. Exh. 19 (Birchell 2023 Tr., p. 89:1 – 3); *see id*., at p. 88:16 – 25. He told Lamb "I've got to take a back seat here and look things over. . . ." *Id*., at p. 89:9 – 10.

  **I.**  **The State Court Lawsuit, the Judgment, and the Debt**

153.  On or about February 22, 2017, Western commenced the State Court Lawsuit against Birchell asserting causes of action based on tort. Pretrial Order, ¶¶ 4.1 – 4.3. Western's

complaint was amended several times to add parties and to add or delete causes of action. *See* Pretrial Order, ¶¶ 4.2 – 4.9.

154.    Initially, the Plaintiffs' complaints did not assert causes of action related to the Purchase Agreement's Non-Compete Clauses. Rather they asserted causes of action for alleged breaches of fiduciary duty, intentional interference with prospective business advantage, and alleged violations of the Utah Uniform Trade Secrets Act. Pretrial Order, ¶ 4.2.

155.    During a deposition of Western in January 2018, Birchell's counsel referenced the Purchase Agreement. He then stated and asked: "And there is a noncompete term in that agreement, but in [Western's] Amended Complaint Mr. Birchell has not been sued for violating the noncompete. Why did Western Chemical choose not to bring that action?"  Western's counsel objected to the question as calling for a legal conclusion and beyond the scope of the 30(b)(6) Notice. Cole Hall, as Western's representative, answered: "Potentially an oversight. I'm not sure why." Pretrial Order, ¶ 4.4. Cole Hall admits that at the time the State Court Lawsuit was commenced he did not remember the Non-Compete Clauses. Cole Hall Tes., at 3:06 – 3:12 p.m.

156.    Birchell was also deposed in January 2018. Birchell did not disclose that he did work for Badlands in 2016. Birchell later admitted at the trial in the State Court that he did not disclose his work. *See* Exh. 20 (Birchell 2021 Tr., at 188:1 – 17).

157.    Ultimately, a *Third Amended Complaint* was filed, a copy of which is admitted as Exh. K. It asserted a single cause of action for breach of the Purchase Agreement based on the Non-Compete Clauses, and Western's prior tort claims were abandoned. Pretrial Order, ¶ 4.9.

158.    The parties filed in the State Court Lawsuit a *Second Amended Joint Pre-Trial Stipulation as to Facts, Exhibits and Witnesses.* Pretrial Order, ¶ 4.10. Therein, the parties agreed

that the issues of fact to be litigated at trial were "[t]he amount of damages suffered by Western, and in turn, the individual Plaintiffs, as a result of Birchell's competition during the 24 months after Birchell forfeited his ownership interest in Western." Pretrial Order, ¶ 4.10(c).

159.    The State Court conducted a bench trial on July 28, 2021. Pretrial Order, ¶ 4.11.

160.    On November 3, 2021, the State Court entered the FFCL admitted into evidence in this Proceeding as Exh. 2. *See* Pretrial Order, ¶ 4.12.

161.    Paragraphs ¶¶ 1 – 48 of the FFCL are "**Stipulated Facts**" agreed to by the parties in the pre-trial stipulation (and defined herein as such). Exh. 2 (FFCL, at pp. 2 – 11); *see* Pretrial Order, ¶ 4.12. None of the Stipulated Facts are contrary to this Court's findings herein and all have been incorporated herein, except the Stipulated Facts set forth in ¶¶ 2, 4, 20 and 21 because they are not material or relevant to the issue in this Proceeding.

162.    Included in the parties' Stipulated Facts, is the following statement: "As a result of Birchell competing against Western, Western has sustained damages consisting of the loss of the deal with Badlands Energy, specifically the lost profits Western would have earned if Birchell had not usurped this corporate opportunity that belonged to Western." Pretrial Order, ¶ 4.10(b) (quoting Exh. 2 (FFCL, Stipulated Facts, ¶ 48)).

163.    The State Court made additional findings of fact set forth in ¶¶ 1 – 21 of the FFCL, defined herein as the "**Trial Facts**." Exh. 2 (FFCL, at pp. 11 – 17). None of the Trial Facts are contrary to this Court's findings herein and all have been incorporated herein, except those Trial Facts set forth in a portion of ¶ 3 and ¶¶ 5 and 9 – 21 because they are not material or they are not relevant to the issue in this Proceeding.

164.    Based on its FFCL, the State Court entered a *Judgment* on December 1, 2021, a

copy of which has been admitted into evidence as Exh. 1 (the "**Judgment**"), in favor of Plaintiffs

and --

> [A]gainst Defendants Ben Birchell, an individual, and BB Oilfield Services Inc., a Utah
> corporation, jointly and severally, for the sum of $265,345.00 in lost profit damages, plus
> prejudgment interest calculated through October 31, 2021 in the amount of $130,342.00,
> plus further interest accruing thereon from and after entry of judgment at the judgment
> interest rate of 2.09% per annum, until paid, together with attorney fees and costs
> incurred by plaintiffs in connection with this action in the amount of $216,082.43 and
> expert costs incurred by plaintiffs in the amount of $21,826.18.

Pretrial Order, ¶ 4.13 (quoting Exh. 1 (Judgment)).

165.    The Judgment establishes the existence of Birchell's debt to Plaintiffs (the

"**Debt**"), the nature of the Debt (*i.e.*, damages caused by breach of contract – specifically breach

of the Non-Compete Clauses), and the amount of the Debt. Pretrial Order, ¶ 4.14.[21]

**J.    The Bankruptcy Case and This Proceeding**

166.    On December 7, 2021, Birchell commenced the Bankruptcy Case by filing a

voluntary petition for relief under Chapter 7 of the Bankruptcy Code. Pretrial Order, ¶ 4.17.

167.    An *Order of Discharge* in favor of Birchell was entered in the Bankruptcy Case

on April 8, 2022. Pretrial Order, ¶ 4.22; *see id.,* ¶ 4.21; Bankr. Dkt. No. 16.

168.    The Plaintiffs timely commenced this Proceeding against Birchell by filing a

*Complaint Objecting to the Dischargability of Certain Debts Under Section 523 of the
Bankruptcy Code.* Pretrial Order, ¶ 4.19; *see id.,* ¶ 4.18; Adv. Dkt. No. 1.

---

[21] Birchell appealed the State Court's FFCL and the Judgment. *See* Pretrial Order, ¶ 4.15.

169.    The Plaintiffs ask this Court to declare and adjudge that Birchell's Debt[22] is

excepted from discharge pursuant to Section 523(a)(6) of the Bankruptcy Code. Pretrial

Order, ¶ 4.20; Adv. P. Dkt. No. 1 (Complaint).

## III.    CONCLUSIONS OF LAW

### A.    Section 523(a)(6) and Burden of Proof

170.    Section 523(a)(6) of the Bankruptcy Code provides:

> (a) A discharge under section 727 . . . of this title does not discharge an individual
> debtor from any debt—
>
> . . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to
> the property of another entity[.]

171.    The plain language of Section 523(a)(6) requires proof that the debt in question is

one that is "for willful *and* malicious injury." 11 U.S.C. § 523(a)(6) (emphasis added).

Accordingly, the injury to the Plaintiffs must be both "willful" and "malicious." *First Am. Title

Ins. Co. v. Smith (In re Smith)*, 618 B.R. 901, 912 (B.A.P. 10th Cir. 2020); *Mitsubishi Motors

Credit of Am., Inc. v. Longley* (*In re Longley*), 235 B.R. 651, 655 (B.A.P. 10th Cir. 1999). If

either standard is not met, the Debt is dischargeable.

172.    Section 523(a)(6) also plainly states that the "debt" must be "*for* willful and

malicious injury by the debtor. . . ." (emphasis added). Thus, it is not that the debtor generally

acted willfully and maliciously, but that the debt sought to be excepted from discharge is for a

willful and malicious injury. That is important in this Proceeding because the Debt results from

the Judgment and the Judgment was entered because Birchell breached the Non-Compete

Clauses thereby making him liable to the Plaintiffs for damages. The question here, therefore, is

---

[22] The fact and amount of the Debt are not issues to be decided by this Court as part of this Proceeding. Pretrial
Order, ¶ 4.16.

whether Birchell willfully and maliciously injured the Plaintiffs by breaching the Non-Compete Clauses.

173.    Contrary to Birchell's arguments, there is no need that the Plaintiffs prove a separate intentional tort. *See* Defendant's Trial Brief, pp. 6-10. In *Kawaauhau v. Geiger* (*In re Geiger*), 113 F.3d 848, 853 (8th Cir. 1997), the Court of Appeals for the Eighth Circuit determined that to be nondischargeable "it is necessary that [the debt] be based on the commission of an intentional tort." *See id*. at 852. Although the Eighth Circuit was affirmed, the Supreme Court did not adopt an intentional tort requirement. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 – 62 (1998). The Court stated that "the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.'" *Id.* Thus, the state of mind of the debtor under Section 523(a)(6) is the same as the state of mind needed to prove an intentional tort, but there is nothing in the statute or the case law requiring a creditor prove a separate intentional tort under Section 523(a)(6).

174.    The creditor has the burden to establish that a debt is excepted from discharge under Section 523(a)(6) by a preponderance-of-the-evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). This standard requires proof that "something is more likely so than not so." *Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1154 (10th Cir. 2012).

> In other words, a preponderance of the evidence means such evidence as, when considered and compared with that opposed to it, has more convincing force and produces in your minds a belief that what is sought to be proven is more likely true than not true. The rule does not require proof to an absolute certainty, since proof to an absolute certainty is seldom possible in any case.

*Id.*

175.    The Court of Appeals for the Tenth Circuit also has held that: "Exceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor." *Oklahoma Dep't of Sec., ex. rel. Faught v. Wilcox*, 691 F.3d 1171, 1174 (10th Cir. 2012) (quoting *In re Sandoval*, 541 F.3d 997, 1001 (10th Cir. 2008)).

### B.    <u>Willful Injury</u>

176.    To be "willful" under Section 523(a)(6) there must be a deliberate or intentional injury, "not merely a deliberate or intentional act that leads to injury." *Geiger*, 523 U.S. at 61. "Negligent or reckless acts" do not fall within the meaning of willfulness under Section 523(a)(6). *Id*. at 64 (relying on *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934)).

177.    Thus, in determining whether a debt is for a "willful" injury, the creditor must present "direct evidence that the debtor acted with the specific intent to harm a creditor or the creditor's property, or . . . indirect evidence that the debtor desired to cause the injury or believed the injury was substantially certain to occur. This is a subjective standard." *Smith*, 618 B.R. at 912 (citing *Longley*, 235 B.R. at 657) (affirming the Bankruptcy Court's judgment that the debt owed to a judgment creditor was excepted from discharge where the debtor recruited creditor's employees and clients to start a competing business, took steps to conceal his involvement in the creation of the new company, harbored feelings of animosity towards creditor, and knew with a substantial certainty of the harm that would result from taking creditor's employees and clients (as noted in his testimony at trial)).

178.    A debt arising from the breach of a non-compete contract may be nondischargeable if the breach is willful. *See, e.g., Dorr, Bentley & Pecha, CPA's, P.C. v. Pasek (In re Pasek)*, 983 F.2d 1524, 1526-27 (10th Cir. 1993).

179.    Applying this law, the Court concludes that the Plaintiffs have not established by a preponderance of the evidence that the Debt is for a willful injury to the Plaintiffs.

180.    There is no evidence that Birchell acted with the specific intent to harm the Plaintiffs when he breached the Non-Compete Clauses.

181.    Furthermore, as discussed below, the indirect evidence does not establish by a preponderance of the evidence that the Debtor desired to injure the Plaintiffs by breaching the Non-Compete Clauses. Nor does the indirect evidence establish by a preponderance of the evidence that Birchell believed an injury to the Plaintiffs was substantially certain to occur when he breached the Non-Compete Clauses.

<u>The Plaintiffs have not established by a preponderance of the evidence that
Birchell desired to injure them when he breached the Non-Compete Clauses.</u>

182.    The Plaintiffs must establish by a preponderance of the evidence that Birchell desired to injure them by breaching the Non-Compete Clauses. Reviewing the evidence, however, it is not more likely than not that Birchell desired to injure the Plaintiffs by breaching the Non-Compete Clauses and, therefore, the Debt is not for a willful injury to the Plaintiffs within the meaning of Section 523(a)(6).

183.    The Plaintiffs rely primarily on circumstantial evidence that Birchell breached the Non-Compete Clauses because he desired to harm them. Specifically, they point to the circumstances that led to him leaving Western and the hostility between the parties at that time, his alleged attempt to hide his involvement in the Badlands Job, and possibly, a conspiracy between Birchell, Duncan, Lamb and Jensen. For the reasons outlined below, the evidence does not establish these arguments and allegations.

184.    Although Birchell states he just wanted to move on when he left Western, the evidence shows that Birchell had reason to be upset and angry with the Plaintiffs when he breached the Non-Compete Clause because, among other things:

    i.    Western cut Birchell's salary and then terminated his employment.

    ii.    Birchell was his family's sole breadwinner, and he did not have sufficient income from other sources to support his family.

    iii.    The KCl-related business was Birchell's primary area of work and there was a significant downturn in this type of work when his salary was cut, and his employment was terminated.

    iv.    His membership interest in Western was diluted and/or foreclosed.

    v.    Through his guarantee of the BH Associates Note, Birchell was saddled with Western's debt to BH Associates even though he no longer had an interest in the company or was being paid a salary.

185.    Additionally, the evidence shows that there was hostility between the parties when Birchell breached the Non-Compete Clauses because, among other things:

    i.    Prior to Birchell's departure from Western, there were difficult discussions between Birchell and Arnold.

    ii.    Birchell believed that Arnold mismanaged the company and was neglecting his duties, and that Arnold and Cole Hall were not attentive to the business.

    iii.    Birchell and Arnold acknowledged bad feelings between them at the time Birchell left Western.

    iv.    After he left the company, Birchell or Taylor (at a meeting at which Birchell was present) threatened legal action and hiring a forensic accountant.

v.      Birchell had suspicions that he and Taylor were being forced out of the

company by Arnold and the Hall Family.

vi.     Birchell did not like the way his partners ran the business, he did not like

their character, and he did not want to be associated with them anymore.

186.    Although Birchell was disappointed, upset and angry and there were feelings of

hostility between the parties, the Plaintiffs did not prove by a preponderance of the evidence that

the Debt resulting from Birchell's breach of the Non-Compete Clauses was incurred because

Birchell subjectively wanted to injure the Plaintiffs. This conclusion is based primarily on two

factors.

187.    First, Birchell testified that he did not want to injure Western when he pursued the

Badlands Opportunity and took the Badlands Job. Rather, he maintains that he was motivated to

pursue the Badlands Opportunity and do the Badlands Job because he was his family's sole

breadwinner, and his family was struggling financially. This motivation is entirely credible and

is supported by the evidence. At the time the Non-Compete Clauses were breached, Birchell did

not have a salary and had not had one for several months, BBOS was not producing sufficient

income to support his family, his family was selling assets and trying to survive, and he did not

have another job.

188.    Second, the overwhelming evidence is that Birchell did not remember the Non-

Compete Clauses that he agreed to in 2014 when he breached them in 2016. That Birchell did not

remember the Non-Compete Clauses is credible. Although he remembers reviewing the Purchase

Agreement and discussing its terms in 2014, it is reasonable that Birchell, who did not involve an

attorney in his termination, did not remember the Non-Compete Clauses in 2016 when he

breached them.

189.    The fact that Birchell's lawyer in the State Court Lawsuit raised the Non-Compete Clauses in a 2018 deposition does not establish, as suggested, that Birchell knew about the Non-Compete Clauses when he breached them. *See* Pls. Trial Brief, pp. 35-36. It is entirely believable that Birchell gave his attorney documents related to Western when he was sued and the attorney pointed the Non-Compete Clause out to him at that time.

190.    It appears none of the parties remembered the Non-Compete Clauses which lends credibility to Birchell's testimony.

i.    Arnold testified that the Non-Compete Clauses were essential to the 2016 Purchase Agreement, but neither he nor any other member of Western's management reminded Birchell about them when his employment was terminated or his membership interest was diluted and/or foreclosed.  This was true even though, according to Arnold, Western intended to continue the KCl business after it terminated Birchell and he knew that Birchell was experienced in pricing, producing and supplying KCl. Arnold also did not cause the Non-Compete Clauses to be enforced when he learned that Birchell was doing the Badlands Job. All of these circumstances show that, despite his testimony, Arnold did not remember the Non-Compete Clauses in 2016. That he was trying to keep Western afloat and did not have the time or money to enforce the Non-Compete Clauses is not credible especially if he knew Western was going to engage in KCl work in 2016.

ii.    Cole Hall, as a company representative, stated he did not recall the Non-Compete Clauses in 2016 or in a 2018 deposition.

iii.    Brad Hall, who was a Western Member because of a power of attorney, clearly did not know about the Non-Compete Clauses because he tried to get Birchell to

sign a non-compete agreement after Birchell's employment was terminated and Birchell

was already working the Badlands Job.

iv.    Finally, once the Non-Compete Clauses were raised in the 2018

deposition, the Plaintiffs abandoned all their earlier causes of action against Birchell,

and pursued only a cause of action for breach of the Non-Compete Clauses.

191.    Much was made of the interactions between Brad Hall and Birchell. This ill will

was presented to establish that Birchell acted with an intent to harm the Plaintiffs. Yet, the

question here is Birchell's intent when he breached the Non-Compete Clauses. These

interactions, all of which took place well after Birchell had breached the Non-Compete Clauses,

are irrelevant.

192.    Plaintiffs maintain that Birchell's knowledge of Non-Compete Clauses and/or that

he was intentionally engaging in bad acts is established in part because he hid his involvement in

the Badlands Job. This argument was not conclusively established for several reasons.

i.    There was no evidence that Birchell told anyone that his involvement in

the Badlands Job should not be disclosed while he was pursuing the Badlands

Opportunity or when he commenced work on the Badlands Job.

ii.    He made a deal with DJ Oilfield while Jensen was still a Western

employee, and he did not tell Jensen to keep their deal secret or to hide his involvement

in the Badlands Job. Jensen ultimately told Arnold about Birchell obtaining the work.

iii.    Although Birchell had not used BBOS for KCl work previously, Western

knew about BBOS and it is reasonable that Birchell would want to do business through

his company.

iv.      It was not until after Birchell felt that he and his family had been

threatened by Brad Hall (well after he breached the Non-Compete Clauses) that Birchell

told Lamb he needed to take a "backseat." The full context of the correspondence

containing this statement is not clear.

v.      Similarly, while giving false testimony is never acceptable and diminishes

Birchell's credibility, Birchell admitted in the State Court trial and in this Proceeding

that he had lied and plausibly owned up to it on the basis that he feared Brad Hall.

193.   The Plaintiffs also suggest that there was a conspiracy between Birchell, Lamb,

Jensen and/or Duncan, all of whom were business associates and/or friends, to provide work to

Birchell on the downlow. This conspiracy was not established by a preponderance of the

evidence.

i.      Lamb did not know Birchell's contacts with Duncan when he agreed to

pursue the Badlands Opportunity with Birchell.

ii.      Although Jensen was still employed at Western when DJ Oilfield, Birchell

and Lamb made their agreements related to the Badlands Job, Jensen said he was not

involved in Birchell's and Lamb's pursuit of the Badlands Opportunity. DJ Oilfield

already had work on the Badlands Job when he agreed to a cut of Birchell's and Lamb's

KCl profits for use of DJ Oilfields' MSA. The amount of Jensen's cut was not

established to be out of the ordinary course of business in the oilfield industry. Jensen

informed Arnold of Birchell's work on the Badlands Job.

iii.      Duncan did not know that Birchell had left Western when he called him

about the Badlands Job. It was not out of the ordinary that Duncan did not engage in a

formal bidding process on the KCl work. Badlands "just went with" Birchell's and

Lamb's bid which looked like it would save trucking and production time because he

was busy. After being approached by Western, Badlands agreed to Western doing KCl

work on the Badlands Job.

    iv.      Finally, that Birchell, who did limited physical work on the Badlands Job,

was paid $96,000 through BBOS does not establish untoward behavior. There was no

evidence that the sum paid to BBOS was unusual in the oilfield business for the work

Birchell did perform.

194.    Birchell stipulated that he "usurped" corporate opportunities from Western. This

stipulation, however, does not establish that he desired to cause injury to Western. "Usurping" an

opportunity means only that one takes an opportunity illegally. *Usurp*, Oxford English

Dictionary, https://doi.org/10.1093/OED/1191099639 (last visited December 20, 2024) ("to

appropriate or seize wrongfully or forcibly…"). It was established in the State Court Lawsuit that

Birchell breached the Non-Compete Clauses and therefore illegally took an opportunity from

Western. The Plaintiffs have cited no law, and the Court has found none, that this type of taking

carries with it the subjective intent to injure the Plaintiffs required to be established in this

Proceeding.

195.    For all of these reasons, the Plaintiffs have not established by a preponderance of

the evidence that Birchell had an intent to harm the Plaintiffs by breaching the Non-Compete

Clauses.

    <u>There is not sufficient indirect evidence to establish by a preponderance of the evidence
that Birchell believed injury to the Plaintiffs was substantially certain to occur.</u>

196.    As discussed above, the evidence shows that Birchell did not remember the Non-

Compete Clauses when he breached them in 2016 and, therefore, Birchell could not have

believed that by breaching the Clauses injury to the Plaintiffs was substantially certain to occur.

197.    Even if the Court disregarded that Birchell did not remember the Non-Compete

Clauses, the Plaintiffs did not establish that it was more likely than not that Birchell knew that

his pursuit of the Badlands Opportunity and work on the Badlands Job would harm the Plaintiffs.

198.    Although Birchell knew of Western's financial difficulties when he left the

company, he did not believe he was competing with Western to get the Badlands Job. Birchell

attempted to secure the Badlands Job for Western during his employment with the company, and

only made his own proposal after he thought Western was no longer pursuing KCl business. He

had reason to believe Western was no longer in the KCl business. He raised the Badlands Job

with Western as a reason to keep him on, but Western did not do so and Birchell thought that

Arnold was not interested. Also, Birchell's understanding of Western's intent not to continue the

KCl business was supported by the decline in Western's KCl work in 2016; Birchell's

understanding that the company would focus on other chemicals given Western's procurement of

larger production chemical contracts; and his termination, despite being the primary driver of the

KCl business. These circumstances cut against the conclusion that Birchell acted with a culpable

state of mind vis-à-vis Western.

199.    Accordingly, the Plaintiffs have not established by a preponderance of the

evidence that Birchell believed that injury to the Plaintiffs was substantially certain to occur by

his breach of the Non-Compete Clauses.

### C.      **Malicious Injury**

200.    Because Birchell's Debt to the Plaintiffs is not for a willful injury to the Plaintiffs,

an analysis of whether it was also a malicious injury is unnecessary under the plain language of

Section 523(a)(6). The Court does, however, conclude that the Debt was not for a malicious

injury.

201.     For an act to be "malicious" it must be one that "is performed without justification or excuse." *Am. First Credit Union v Gagle* (*In re Gagle*)*, 230 B.R. 174, 181 (Bankr. D. Utah 1999) (Boulden, J.) (discussing *Pasek*, 983 F.2d at 1527). This essentially requires an inquiry into the debtor's motives. *Smith*, 618 B.R. at 919, *quoted in Glencove Holdings, LLC v. Bloom (In re Bloom)*, No. 22-1005, 2022 WL 2679049, at *7 (10th Cir. July 12, 2022). A "totality of the circumstances" test is applied to determine whether the act created an injury that was without justification or excuse. *Smith*, 618 B.R. at 920.

202.     "[A]ll the surrounding circumstances, including any justification or excuse offered by the debtor, are relevant to determine whether the debtor acted with a culpable state of mind vis-à-vis the actual injury caused the creditor." *Pasek*, 983 F.2d at 1527, *quoted in Smith*, 618 B.R. at 919.

203.     Again, applying this standard, the Plaintiffs have failed to establish by a preponderance of the evidence that Birchell's breach of the Non-Compete Clauses constitutes a malicious injury. Birchell credibly testified as to his state of mind before, during, and after committing the breach—providing reasonable justifications for his actions and insight into his motives, none of which could be construed as malicious towards Plaintiffs.

204.     The Plaintiffs argue that the following circumstances show that Birchell was intent on harming the Plaintiffs: Birchell "almost immediately" went to Badlands and took the business he had been negotiating for Western; he admitted he was trying to conceal the work; he was angry at Arnold and Brad Hall; and he knew the injury would be significant because of Western's precarious finances. Pls. Trial Brief, p. 35.

205.     Birchell's testimony at trial, however, paints a different picture. Rather than being motivated by anger or an intent to injure Western, Birchell's motivation in pursuing the Badlands

Job was to use his skills and working relationships to provide needed income for his family during a difficult financial time. Birchell was the sole provider for his family, and after his termination from Western, the family was not bringing in sufficient income to meet their needs. Accordingly, he made the decision to use his knowledge and contacts in the KCl business to help supplement the family income. Such an intention cannot reasonably be construed as malicious towards Western. Furthermore, it provides a reasonable justification for Birchell's actions.

206.    That the Badlands Opportunity presented itself shortly after Birchell stopped working at Western does not establish that he acted with malice toward the Plaintiffs. When Birchell left Western, he knew that it was in financial distress. But there is no evidence that Birchell pursued the Badlands Opportunity or took on the Badlands Job to harm Western. As discussed, he was simply trying to provide for his family.

207.    The Plaintiffs' argument that Birchell knew his pursuit and execution of the Badlands Job would cause significant injury due to Western's precarious finances is undermined by the fact that Birchell did not believe that Western was pursuing the Job. Since he did not believe Western was pursuing the opportunity, there was no reason for him to believe it would cause Western significant injury if he secured the work for himself.

208.    Additionally, Plaintiffs argue that the fact that "Birchell was angry at the time with both Brad Hall and Joe Arnold" shows some level of malice. Pls. Trial Brief, p. 35. But, as discussed above, the anger directed at Brad Hall is irrelevant. The record reflects that Birchell's conversations with Brad Hall began in August 2016, after he had already pursued the Badlands Opportunity and had commenced work on the Badlands Job. As to Arnold, Birchell testified that, while there were "some bad feelings" and concerns about mismanagement, he did not hate Arnold or want to harm him or Western. His actions appear to have supported this stance in that

he never told anyone not to work with Western and there is no evidence that he bad mouthed Arnold or anyone else from Western after his departure.

209.    Plaintiffs argue that Birchell's attempt to conceal his actions shows malice. Based on the discussion above, there is not sufficient evidence to establish that Birchell acted to conceal his work.

210.    This case is unlike *Smith*, where the court found the attorney debtor's attempt to conceal the breach that caused the Plaintiff's injury supported finding a culpable state of mind where the debtor "intentionally concealed" his actions because, among other things, he "knew his actions were inconsistent with his legal and ethical duties" and knew he "had to keep his plans secret … so he could take twenty-seven employees before [the plaintiff] could respond in a meaningful way…." 618 B.R. at 909. In contrast, Birchell testified that any attempts to conceal his involvement in the Badlands Job were motivated by his conversations with Brad Hall, which he perceived as threatening, as opposed to a knowledge that he was breaching the Non-Compete Clauses or was trying to buy himself time to effectuate any nefarious purpose. Also, unlike *Smith*, Birchell did not remember the Non-Compete Clauses and he did not think he was competing with Western because he thought that they were out of the KCl business.

211.    For all these reasons the Plaintiffs have not established that the Debt is based on a malicious injury because they have not shown that Birchell acted without justification or excuse by a preponderance of the evidence.

###    D.    <u>Application of Barring Principles</u>

212.    There has been significant argument about the effect of the FFCL in the State Court Lawsuit, admitted into evidence as Exhibit 2. *See, e.g.,* Pls. Trial Brief, at pp. 28 – 33; Def.'s Trial Brief, at pp. 11 – 14.

213.     The Court need not address that issue because, as discussed, all the FFCL's

Stipulated Facts and Trial Facts relevant to the issue before this Court have been incorporated

herein.

### IV.     **<u>CONCLUSION</u>**

214.     The Court concludes that the Debt resulting from Birchell's breach of the Non-

Compete Clauses was not for a willful or malicious injury to the Plaintiffs and, therefore, it may

not be excepted from Birchell's discharge under Section 523(a)(6).

215.     The Court will enter a judgment concurrently herewith.

**-END OF DOCUMENT-**

## <u>DESIGNATION OF PARTIES TO BE SERVED</u>

The foregoing *Findings of Fact and Conclusions of Law* shall be served on the parties in the manner designated below:

**By Electronic Service**: The parties of record in this case, as identified below, are registered CM/ECF users.

- **Matthew M. Boley**    mboley@ck.law, krenak@ck.law
- **Tyler P. Hardman**    tylerhardman@utah.gov
- **James A Sorenson**    jsorenson@rqn.com, docket@rqn.com;asanchez@rqn.com;ajohnson@rqn.com

**By U.S. Mail**: In addition to the parties receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

   *None.*